of this panel sitting. For those of you who have argued here before, you know we have our colored light system here. Green is go, of course. Yellow, you've got about two minutes, and when you see the red light, please finish the sentence you're in, unless you're answering a question. Please finish the sentence and conclude. We're going to go ahead and start. We have two cases set for oral argument today, the first of which, also when you do take the podium, recognize that we are familiar with all of your briefing and a lot of the key cases that you've cited, so if you tailor your remarks accordingly, that would be appreciated. So the first case we have today is John Rash v. Lafayette County, Mississippi, No. 24-60558. Mr. Youngwood, you're going to begin. Thank you, Your Honor. May I proceed? Yes, please. Thank you. Jonathan Youngwood, Simpson-Thatcher & Bartlett, fourth plaintiff, and both appellee and appellant John Rash. Your Honors, in the summer of 2020, the County of Lafayette, Mississippi, enacted a policy that broadly banned nighttime speech at the center of its town square, its historic courthouse grounds, a park-like area with grass, benches, and paths. There are many pictures of the grounds in the record and much testimony describing them, and there is much evidence of its prior and current uses. As Judge Biggers, the original defendant, states during the preliminary injunction, the courthouse grounds function as a public park and have long been a site of protests, rallies, and other community activities. These are the hallmarks of a traditional public forum. This ban, like other aspects of the facility's use policy, is only directed at speech the county, its supervisors, and the public, and is not directed at being pursued into a standard list analysis covered by the policy. So, for example, according to multiple witnesses, prayer, even group prayer, on the grounds is not covered or prohibited while political speech is. Anything being casual by the county administrator or by others working for the county, a term that is not defined, is not covered by the policy, but even two people engaged in political speech directed towards others would be. Well, even one person, according to the Sheriff East, who enforces the policy, occupying space to deliver a message that might be political, would require a permit. The nighttime ban was put in place in the wake of the May 2020 murder of George Floyd, and the First Amendment activity that followed on the courthouse grounds in the area surrounding a statue of a Confederate soldier that is also connected to the grounds and part of county property. Counsel, let me ask you a couple of questions regarding mootness or voluntary cessation. Yes. Setting aside the curfew provision, do the remaining challenge provisions in the July 20th 2020 form violate the First Amendment? They do, Your Honor. The insurance provision, for example, hasn't been changed. So that is a significant restriction on anyone who wishes to use the grounds for more than 50 people. It also has certain indemnification obligations that can chill speech because if you plan an event, I'm not sure if that's me or someone else. I'll step back a little bit on that. That too is completely chilling, Your Honor. The number of people that need to be exceeded to seek a permit is also still stunningly vague and completely unconstitutional. I believe, Your Honor, that as few as two people and perhaps still as few as one people person would need a permit to use the grounds for any purpose that the county deemed appropriate. What about the sheriff protection provision? The sheriff protection provision has been changed by adding something that, again, is standardless, which is that if you're engaged in First Amendment activity, you are accepted from it, but it doesn't tell us what First Amendment activity is. This is a pretty good example of what at least our plaintiff believes to be First Amendment activity, and the county is not the same, but there's no guideline. It's just blank as to whatever they deem to be First Amendment activity, which means somebody is going to have to apply for a permit, see if they get it, and then if they don't, their cessful sheriff protection fee, come to the courts, which are here to decide these things. But again, as this case has shown, because I'm standing in front of you five years, more than five years after the incident that gave rise to litigation, that, too, is a circular action, particularly when you're talking about the chilling of First Amendment speech. The advance notice requirement, Your Honor, five days is still too long. There's no justification for it, and as the letter we submitted on Friday shows, county's not even following it. We submitted a letter on Friday on the plaintiff, who's here with us today, that did seek permission to use the grounds for a similar type event in early December. He applied in the middle of October. The current policy says we'll let you know within three business days. He has not heard yet from them, and again, that is an activity that he sought to do that will certainly straddle nighttime hours, and even on the clarification, and we will concede that saying sunset is better than dusk. That is better than dusk, but it doesn't solve the over-breath problem of the nighttime ban. Let me ask you about standing, and I know you're going to get to this, but since we're here now, would the plaintiff's facial pre-enforcement challenges to the non-curfew provisions, must the plaintiff show that each provision of the policy has a deterrent effect on speech, or is only one enough to challenge the entirety? Well, we're not seeking to strike down the entire policy. We've been specific on the provisions, and so I think that you could look at them, and I don't know if this is your question, Your Honor. I may be misinterpreting them. Certainly, if we can show any one of them is a chilling effect on speech, regardless of whether or not it was a given reason in the permit denial, and I know that's an issue in the briefing. If we can show any one of them is a chilling effect on speech for somebody like Mr. Rasch, this is not the camp case where one of the provisions at issue clearly didn't apply to the plaintiff, because the plaintiff is not a commercial entity. So that's not this. All of these could apply to him. If we can show you that any one is chilling, that one should be stricken down, but I think there's also a concept that if, I don't want to do it in numbers, but if together two or three of them act to chill, and working together they act to chill, I think that also should be stricken down, even if one individually did not. You answered my question. I want to be clear that there are multiple provisions that are the subject of your appeal here today that you're asking the court to review, and standing being also an issue, we would have to find standing as to each one of those challenge provisions. Is that a correct statement? Let me give you two answers to that. First, if you do find standing for any individual provision, it's certainly before you to decide. Second, if you find that any one of the provisions acting alone isn't sufficient, but it interacting with two or three others, I think you then have standing for all, whatever that direction is. If you were to find that one of the provisions in no way chills speech, no matter acting alone or together with others, then I don't think you should consider that claim here. Mr. Youngwood, let me ask you a related question. There are six different provisions. Would you consider Mr. Rash's claims ... Let me ask it differently. Would you consider Mr. Rash to have six separate claims? That is, a First Amendment challenge as to one, a First Amendment challenge as to two? They are all listed in the complaint. They are listed in the pretrial order, and the district judge outlined them all individually in her decision. But I think it gets back to Judge Englehart's question that some of them do interact with each other. I think all of them interact with the proper purpose used. What is it that you have to have done or not done to be subject to the permitting requirement? I think they all overlap with that. Why is the better way of thinking about this not to say, look, Mr. Rash has a First Amendment interest in projection. It's being interfered with by the county. It's really one claim. It's a First Amendment claim of interference. Maybe you could say it's two, and as applied in facial, because the relief in those are different. But you're losing me on we're seeking to strike down individual provisions. I mean, as you know, that's not the way we normally ... Well, I will say perhaps this, Your Honor. If you strike down any handful of these provisions, there is no policy left, and so while we haven't challenged every word of the policy, acting together, this is an unconstitutional policy. I do think there are some of the provisions, and again, just to be transparent, the Nighttown Ban clearly being one of them, that could fall or arise on its own. I think most of the others interact, and I think the number of people on the advance notice, those interact with all of the others. Well, let me ask it this way. Strike down is not a remedy that I'm familiar with in federal courts, right? It's not in the All Writs Act. It's not something that I'm aware of in Title 28. So when you say that, what do you mean? In this case, a permanent injunction enjoining the enforcement of this statute against Mr. Rash, but on a facial basis, and I don't think this is a CASA case, but perhaps that's where you're going, Your Honor. Maybe I'll say why. This is not a CASA case. This is not one district judge getting a nationwide injunction. This is one district judge, now before the appellate court that sits over that district, considering the constitutionality of a policy enacted by this county. If it is facially invalid, it is going to be facially invalid for everyone in that county. I cannot see, and I do not suspect the county would continue to enforce it. But I am not asking for a CLASP. This is not a CLASP. I'm not asking for a county-wide or anything-wide injunction. We have one plaintiff. I concede that. I'm glad you brought up, I call it CASA, but however you'd like to pronounce the case name. I agree with you that this is obviously not nationwide. It doesn't have any of the hallmarks that most people cite that case for. But the thing I'm concerned about is that the Supreme Court has been very clear to say the question before us in any injunctive case is how, whether, and to what extent we can afford complete relief to the party before us. And so I'm wondering if complete relief to Mr. Rash is to say there's a First Amendment challenge to the application of this particular ordinance against him. The county has not been able to show that this is a reasonable time, place, and manner restriction or whatever the sort of narrowest way one could write that injunction. And therefore, he has an opportunity to show his movie unless and until the facts change. That, Your Honor, I would suggest is far too narrow and not supported by Supreme Court decision and Moody and others that have a whole different line of cases, which none of us briefed because the CASA came down after this and could supplement if that was helpful. But a whole line of cases that shows in the First Amendment context, that is insufficient. And so, obviously, we chose to bring this appeal for two reasons. One, because the judge did not find that she has a point in an as-applied challenge, the nighttime ban for Mr. Rash was really missing the point of the challenge. Because if that's the remedy, if that's what the case is about, then all we can do is get a time machine and he goes back in time and does the presentation that he would have done in August of 2020. He wants to do it again, but he shouldn't be limited to just movies. He has other things he might want to do at night. The security, the pretextual nature of the security argument is the same no matter what. And there is ample testimony in the record that Mr. Rash has continued to participate in events on the courthouse grounds since 2020, as we gave on Friday. I don't think it's relevant he has applied again without results. And so, I think your question suggests a remedy that is far too narrow. Would another party, if Mr. Rash prevails completely before you today, would another party be able to come in if the county enforced the policy against them and seek contempt or something? Absolutely not. They're not a party to this case. They wouldn't be able to. But the ruling here should be that facially on the stick of the nighttime ban, that you can't have a ban that today with the amended policy, which I'm not quite sure their position on the nighttime ban on a facial challenge, but today since the grounds are closed from 8 to 5 completely, no basis for that, 8 to 5 completely and then only open until an hour after sunset this time of year, unless you want to go find a window between dawn and 8 a.m., which I think also doesn't happen much this time of year, the grounds are effectively closed. So, to the extent that the county has a right to enforce a certain other respect, because they've added words, but the words further lack definition or standards. And so, it's something that's been left completely to the discretion of the administrator. Counsel, you mentioned the pretrial order, I should say amended pretrial order, which of course guides the trial that was held and issues that were treated at the district court, but I did not see in there anything that identifies a vagueness claim or a denial of proposed usage claim in the amended pretrial order. Where can I find that? Well, Your Honor, looking at page 6 of the pretrial order at record, I think it's at 3314 on the bottom, C, and from page 6 to 7, it lists the legal issues being contested. Each of them contests that the provisions that we've been discussing violate the First Amendment. It doesn't say every way that the First Amendment is violated, that is true, but I would point you to that. I think the district court didn't disagree on that. In fact, there's some footnotes in her decision that go the other way. You can challenge a provision based on vagueness as we did, and you can challenge the provision based on over-breath, which we did, and although the district court never reaches a clear, I see my, there's my sentence, as you said, although the district court never reaches a clear ruling on the over-breath, for example, of the nighttime ban, she actually goes through every element that one would have to go to reach a conclusion that it fails on the over-breath test. Okay. Thank you, Counsel. You have five minutes for rebuttal. We'll hear from Mr. O'Donnell now. May it please the Court? I'd like to address the standing argument issues first. I think that's of concern with the Court apparently more than the other issues, but I also want to address the district court's ruling on the constitutionality of the Dusk to Dawn policy, which I believe the Court clearly erred in applying the narrow tailoring test really for application of the review of that policy really coincided with the strict scrutiny, least restrictive means test as opposed to narrow tailoring test. To get to the standing issues, the law is clear that it's Mr. Raff's burden to prove standing as to each and every issue. It's an issue by issue, claim by claim analysis. And I take issue with Mr. Youngwood's statement that we can look at the provisions that they attack other than the Dusk to Dawn policy as an amalgam or a collection of issues. That's not the test. It's issue by issue. And if we look at Mr. Raff's trial testimony, that's what we're left with. What did he testify to in the record as far as the impact of our policies on his intended speech? And the only impact that he testified to was the Dusk to Dawn policy prevented his art show because he needs darkness to produce his art show. And therefore, that's the policy that he claimed violated his First Amendment rights. There's no chill here in any sense because he applied for the permit under the policies that they're attacking today. So chill is a pre-enforcement issue, not an as-applied issue in terms of standing requirements. So there are no other issues with regard to our policies that Mr. Raff testified to that impacted his desire to engage in speech. If we look at the record, and it's laid out in our briefing, I'm not going to go back over that. But he failed on his standing argument on standing proof for the district court as far as his attacks on the other provisions of the policy other than the Dusk to Dawn as-applied. He clearly has standing on that issue. As far as the attack on the Dusk to Dawn policy, the constitutional attack, I believe the district court's analysis was too narrow. The district court started the evaluation of our policy based on the particular context of the nighttime restriction as opposed to our policies, the general application of our policy that allowed uses during the daytime, restricted uses only to the courthouse grounds. And it is a functioning courthouse. There are some cases that talk about courthouse grounds being park-like, etc., but they're not dealing with active courthouses. In this case, we have a very active courthouse within the context of a very active town square. And the testimony is undisputed that the activity levels in the town of Oxford has grown exponentially over the years, starting in approximately 2010 through the time that we adopted this ordinance, 2015, and then it's amendments subsequent to 2015 through in this policy. Well, in 2021, I believe was the last amendment prior to the 2024 amendment, which was issued after the district court issued the ruling. So, governmental interest. The district court talked about the county's compelling governmental interest in terms of public safety, traffic safety. And those are a matter of law in a general, generic sense, but we look at the specifics of our case. The record showed that the nighttime activity around the Oxford Square presented a real issue of pedestrian and traffic safety. It is a town square that was growing. The proof is that we had 30 bars and restaurants within a four-block area of the town square. We have a student body that is increasing in size over the years. Produced a real concern by local law in terms of controlling the crowds around the Oxford Square, especially during the evening hours. That is our general governmental interest that's at stake in this case. So, testimony from the sheriff and the chief of police related to the draw of any activity on the courthouse grounds at night with regard to the activities that are around the courthouse. The proof was that the activity, if we allowed it on the courthouse grounds, created a level of distraction. And we can talk about that both in terms of actual experience and common sense. Is it distraction or public safety? I understood to be people walking and people going to bars and restaurants and staying out late. I thought that was the gravamen of the county's concern. Well, the concern is, of course, there is testimony about that. And that was certainly a large concern. But the concern is any night-time use of the courthouse grounds and its impact on pedestrian safety, driver distraction. And what Mr. Rasch wanted to do is a perfect example of that. And if you look at the preliminary injunction hearing where Judge Biggers questioned counsel about Mr. Rasch's proposed projection show and how that would affect public safety, traffic safety, and producing a level of distraction by drivers driving around the courthouse. Again, context is important in this case. The town square is a very circumscribed area. We have a road that circles the courthouse in a one-way direction with a lot of bars and restaurants in the immediate vicinity facing the courthouse. Judge Biggers questioned the safety of allowing a projection show at night because it was actually intended to be viewed by passing motorists, not a safe activity. So anything relating to activities on the courthouse grounds at night as far as whether it would produce a level of distraction for passing motorists would affect pedestrian safety. But the ordinance covers, in this particular instance we're talking about projecting things onto a building where drivers could see them. But what if it were, the ordinance would apply just as well to a group of people who wanted to assemble to protest whatever political or whatever popular cause they would like to express themselves about. So if we remove the context of the distraction of the projection, we still have the issue of public safety, don't we? We still have the issue there. Any level of activity on the courthouse grounds, certainly speech-related activities, and that's really what the First Amendment Claim regards. But what concerned me when I was reading your brief, what concerned me is that there's an evaluation of a balancing of just how much First Amendment you get compared to what the cost is in terms of security. So I understood your argument in the brief, and you can tell me I missed the boat here, but the fact that local law enforcement would be involved in policing the restaurant and bar scene at night, and they would not have resources enough to secure a protest, an active protest on the courthouse grounds. That's what I understood one of the arguments in the briefing to be. Is that a fair characterization? And it's an issue that revolves around a split between county law enforcement versus city law enforcement. County law enforcement has jurisdiction over the courthouse grounds because that's a county facility. The city police department, they have a backup role, but it's not their job to police city, or not their authority to police county regulations. I guess at the end of the argument, taken to its logical conclusion, are we saying that we just can't afford certain aspects of the First Amendment of people who want to assemble, if it's at a certain time of day, we just can't afford it in terms of law enforcement resources? That's a factor to consider, but it's not determinative. That's not what our position is, is that we don't have adequate law enforcement to police. This is a policy decision by the county, and if we go back to what the First Amendment requires, it requires that the county, we can put time, place, and manner restrictions in, but we can't burden substantially more speech than necessary. And there's no showing in this case that that is being done, because number one, we don't have speech activities going on at the courthouse grounds at night, historically. It's just not done. It's dark. It's not a time and place that is used for speech-related activities. So, what's the evidence of whether our policy burdens substantially more speech than necessary? That's the narrow tailoring test, and it's actually a tight fit, in our view, because under the Beckerman case, our concern is that night-time use produces heightened risk. There's risk at any time during the day or night, but at night-time, there's a heightened risk. So, we adopt a policy that's geared specifically to darkness, and that darkness limit changes day-to-day. Beckerman commented about that, said when the court had ruled that the parade ordinance in the city of Tupelo was unconstitutional because the concerns about pedestrian traffic safety there, which they tied to night-time, was not well served. It was not a tight fit because they were relying on an arbitrary day and time. And they said, well, darkness depends on the time of year, and therefore, our county, we adopted a policy that gears our policy on the real concern at issue, and that is night-time use, and that's a use that changes day-to-day. And Beckerman said that's a good policy. It's not an unusual policy, easy to enforce. So, we think it's a tight fit here. It doesn't burden substantively more speech than necessary, and that's where the district court went wrong by considering or sifting through to look at the Ward case. They said that's an error, that's more of a strict scrutiny analysis, but looking at alternatives to the policy. And Judge Brown pointed out that there's an alternative here. We could go a certain days of the week, not every day. That, I don't believe, satisfies, or I think it actually is contrary to the substantial burden test under the narrow tailgate. Because we always, we have that concern every day at night. It may be less or more depending on the day of the week, but there's always that concern. So, not having a policy that serves every day instead of adopting a policy, as Judge Brown suggested, only certain days of the week, I think that would lead to an attack on our policy not being narrowly tailored because it doesn't really address all of the circumstances that are popular in our policy or our concerns. Policy should be addressed in terms of the concerns. Counsel, I'm worried that we skipped over a jurisdictional question. I want to make sure I understand before you run out of time. So, I heard you say that you think Mr. Rasch has standing, or at least he testified, to how he's injured by the curfew provision, but nothing else. And then we talked about the merits for several minutes. Am I correct in understanding that you don't think any parts of the changes of the policy from 2020 to 2024 render any part of the case moot? We believe it certainly did render his case moot, but not as to the applied dust to dog. So, then let's unpack it a little bit. So, do you think that Mr. Rasch has brought six separate claims, that is, one claim to each different provision? He has to show standing as to each one of the six? Yes. Mootness does the same thing? Mootness is applied issue by issue as well. Same thing? Yes, sir. So, help me understand which part of, which claim do you think is moot? Okay. The mootness relates to the, they attack the one to five individual. We no longer have a number. Our performance based on whether or not the post use would have a reasonable probability of interfering with ingress, egress, and pedestrian traffic within the courthouse grounds. That's a case by case determination. That's an issue for another case. I'm lost as to how you're getting here. So, what is your authority for the idea that we do mootness claim by claim? Well, the Boudreaux case. I'm sorry? The Boudreaux case is a case where the court said we look at mootness issue by issue, claim by claim. And what do you understand mootness to mean? Mootness means that the claims that are raised in this case, that is the claims against the specific policies that they've identified, are no longer live or present a controversy for the court to decide because the policies that are under attack are no longer in existence. So, what is your authority for that? I mean, the Supreme Court has said over and over that mootness means that there's no relief left for us to grant. That's the standard they've given us. So, maybe we said something different in the Boudreaux case? Is that your position? Well, mootness is introduced by virtue of the fact that policy has been substantively changed to address the concerns that are raised in the complaint. That we have done here. So, if the policy says, you know, it applies to anybody, if any group, 10 or more, they challenge that and they say this is outrageous and unconstitutional and you change it to 5 or more, then obviously you've changed it, but not in any way that's meaningful. That's right, Your Honor. It's a meaningful test. And in this case, your example would be correct. That is that the change in the policy would not moot the issue. But as to the 1 to 5 provision, unless it's political speech, it applies to any one or more people, yes? Not under the current policy. Really? Explain it to me. Well, if you look at the current policy, which we submitted in the addendum. Generally written permission for public assemblies and other claimed events within the county facilities is required. That's the current policy. We have a permit requirement. That's right. No matter how many people. Well, no, there's a further definition in the policy that says these are the people that need a permit. You need a permit if the proposed use will propose, will basically create a disturbance or impact on pedestrian access or regress to the courthouse grounds. So that's the public gathering definition in the policy. So it doesn't, I mean, the same policy does not apply to nonprofits. It does not apply to individuals or groups who are meeting for the purpose of engaging in political discussion or expression. So there's a content-based distinction. Right. Those are the groups that are allowed access. Now is that allowed access in the sense that they get a permit or that they don't have to get a permit? All uses are potentially subject to permit. All uses. Public gatherings, not casual. The current policy decides, attempts to address that distinction. And who gets to decide whether it's casual or political or artistic? The county administrator is the individual who is vested with that authority. Unreviewable discretion? No. Policy also addresses that and it's subject to board supervisor review. And all of that is in three business days? Yes, but we have an Open Meetings Act issued in Mississippi. So if they apply for the permit within three days, well five days of the event, and there's a decision that has to be made within three days, and that is there's a presumption that the permit would be granted. Unless in writing we deny the permit within three days. And if it's denied, they have a right to an appeal. But in the circumstance, for example, that there's a permit within five days of the event, literally. Three days, the denial comes in. So there's two days left for the event. Under the Open Meetings Act, the county needs at least five days to hold a public hearing. So the policy also provides that. If that's the case, then the appeal is to the state court. And if an outrageous thing happens and I need to go talk today, I can do that? Yes. Subject to this emergency exception thing? Right. And who gets to decide it's an emergency exception? That would be the county administrator. Same appeal, same five days? That doesn't sound like much of an emergency to me. Well, if there's an urgent need, in other words, if the policy tries to acknowledge that there are occasions, just like we did in the George Floyd context, that there may be need for spontaneous expression. And we didn't want the permitting regulation to impede that. So we provided for that exception. That's how it was actually applied by the county administrator. All right, Counsel. Anything else? Leave a lot of time. Thank you, Counsel. Okay, we have five minutes of rebuttal by Mr. Youngwood. Thank you, Your Honors. Perhaps just picking up on where Counsel left, if you look at the new policy, I gave you the example earlier of how the change in the time requirements actually made the policy worse, at least for the darker six months where the sun isn't in the sky as much, six months the year before. But the exchange that was just had about paragraph four on page 106 of the new policy, perhaps, I don't know if it's possible to make it clearer that it's a content-based policy, but it's completely content-based policy. As I read this, somewhat shockingly, given the testimony at trial, prayer would be excluded as a use on the courthouse grounds no matter what, unless you want to say that prayer is political. I suppose you could say it, but if that's the case, it's unclear what the word political means. So in that respect, again, to the mootness point, the policy has become worse. Of course, the other part of the mootness inquiry, so you begin with whether or not the changes actually mooted anything. We don't think they did. But then there's the good faith exception test and whether or not the county is entitled to here. And with deep respect for the county, I don't think they are. The county retains full discretion to change the policy at any time on the face of the new policy as on the face of the prior policy. It says at the bottom, the policy remains in effect until revised or rescinded, full stop. If you want an example of what the county has done since 2015 on just one of the changes, the advanced notice requirement, the original policy April 20, 2015 was seven days. It was increased in 2019 to 30, kept there in June of 2020 at 30, then reduced to 14 on July 20, 2020. That was the policy in effect when Mr. Rash first made his application. And then in the middle of the litigation for the first change, reduced, sorry, kept at 14 with some exceptions for urgent need not defined. And now as of November 18, 2024, five. But there's no reason to believe that that won't change again. In fact, there's every reason to believe that it will change again absent an order confirming that five is inadequate and 14 is inadequate. There's no statement from the county saying that it won't make further acts and changes to the policy. Again, as I said, the policy itself says it can't be changed. There's the timing of when this change was put into place, just days after we filed a notice of appeal and within about five or six weeks of the judge's ruling. And then there's the test of whether or not we're still at stake. We're clearly litigating the nighttime ban. I submit we're actually litigating all of these issues. And then perhaps, again, to intent and future likelihood of change in the most recent policy, there is a sentence that purports to change the nature of the form itself from what the district court said was either a traditional public form or designated public form to one by the county acting to a limited public form. So that, of course, would take away much of the rights that we're seeking to have recognized here today. Finally, Your Honor, just a case or two back to the discussion as to whether concerns about nationwide injunctions, which obviously this isn't, and how they might overlap on the First Amendment. Just to give a few sites, because, again, we didn't have the opportunity to brief this, but going back to 2003, Virginia v. Hicks, 539 U.S. 113, speaks deeply on these issues. There are many other Supreme Court cases that also speak deeply on these issues, such as Secretary of State Maryland v. Munson, 469 U.S. 947 law. I don't want to say it's different in the First Amendment, but the concerns are different. And the reason the concerns are different, because when we speak to each other, we're speaking to each other. It's not just one individual's right to do something that's at stake with the First Amendment. It's the community's right to have the ability to hear other people speak. And so while Mr. Ash is the only plaintiff, the rights of his fellow citizens in Lafayette County are also at stake when you have a facial challenge. Thank you, Your Honor. Thank you, Counsel. We have your arguments. Appreciate your briefing and your presentations today, and the case will be taken under advisory.